

# Missouri Court of Appeals

## Southern District

### Division One

MEADOWFRESH SOLUTIONS USA,     )
LLC, et al.,     )
    )
        Plaintiffs-Respondents,     )
    )
      v.     )     No. SD35231
    )
MAPLE GROVE FARMS, LLC,     )     Filed: September 6, 2019
a Missouri limited liability company,     )
et al.,     )
    )
        Defendants-Appellants.     )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Michael J. Cordonnier, Circuit Judge

### **<u>AFFIRMED</u>**

Appellants[1] appeal the trial court's judgment in favor of Meadowfresh Solutions

USA, LLC ("Meadowfresh"), John W. "Jock" Fulton, and Susan Maree Fulton

(collectively, "Respondents") after a jury found that the attempt by minority members of

Maple Grove to oust majority member Meadowfresh from the company and to remove

Mr. Fulton as managing member caused Respondents over 7.3 million dollars in

---

[1] Collectively, "Appellants" includes Maple Grove Farms, LLC ("Maple Grove"), Leon Rinehart, Ted Dahlstrom, Carol Dahlstrom, Curtis Hall, Lisa Hall, Kyle Bounous, Animal Clinic of Monett, Inc., and All American Cattle Leasing, LLC.

damages.  Appellants bring eleven points on appeal.  Finding no merit to any of Appellants' points, we affirm the judgment.

## Facts in the Light Most Favorable to the Verdicts

## Background and Parties

This case involves a dispute among the members of Maple Grove, a Missouri limited liability company that operated a large dairy farm in Jasper County.  The company was owned by Respondent Meadowfresh and Appellants the Dahlstroms, the Halls, and Leon Rinehart.[2]

Meadowfresh was undisputedly the largest owner of Maple Grove, with at least a 63% interest in the company and made the largest capital contribution of all the members.  Meadowfresh's members were the Fultons, the Dahlstroms, and Kyle Bounous.  The Fultons owned approximately 75% of Meadowfresh.  Accordingly, by virtue of their interest in Meadowfresh, the Fultons had the largest interest in Maple Grove.

## The Operating Agreements

Meadowfresh and Maple Grove were governed by their respective operating agreements, which were signed by all of their respective members.  Pursuant to the terms of the Maple Grove Operating Agreement, Mr. Fulton was the sole manager of Maple Grove.  Likewise, Mr. Fulton was the sole manager of Meadowfresh.

Both operating agreements provided the manager, Mr. Fulton, with:

> the exclusive right, power, authority and responsibility to manage and operate the business and affairs of the Compan[ies] and to make all decisions with respect thereto and enter into transactions on behalf of the

---

[2] In order to purchase the farm, Maple Grove received financing from Arvest Bank.  Maple Grove was the maker of the promissory notes and security documents while the loans were guaranteed by Meadowfresh (including members Mr. Fulton, the Dahlstroms and Kyle Bounous, in proportion to their respective ownership interests), and Maple Grove (including members Curtis Hall, the Dahlstroms, and Leon Rinehart, in proportion to their respective ownership interests).

Compan[ies] for apparently carrying on the business of the Compan[ies] and no Member shall have any right or power to act for or on behalf of the Compan[ies] or make decisions with respect thereto.[3]

The Operating Agreements also spelled out the procedure for calling a meeting of the members. Section 10 of the Operating Agreements required a "majority in interest" of the members to be present to achieve a quorum.

**Day-to-Day Operations of Maple Grove**

Maple Grove's main source of revenue came from milk production. Maple Grove sold its milk to Dairy Farmers of America ("DFA"), which required Maple Grove to designate an authorized representative. Maple Grove selected its managing member, Mr. Fulton, an experienced dairy farmer from New Zealand, as the DFA representative.

In addition to being the designated DFA representative for Maple Grove, Mr. Fulton managed Maple Grove from the fall of 2011 to July 2015, and treated the position as a full-time job, averaging 60 to 70 hours per week. Mr. Fulton searched for best practices and handled the finances and performed compliance work. His wife, Susan Fulton, assisted with paperwork from the home office. Mr. Fulton regularly communicated with the other members regarding issues such as using particular minerals in the feed and the health of the cows. Mr. Fulton did not make decisions regarding minerals and animal health unilaterally.

Although there was never a formal vote for anyone to receive money from Maple Grove, the members were compensated for providing services. Curtis Hall, a member of Maple Grove, worked on the farm daily as an employee of Maple Grove and received a

---

[3] Other than the named members, the capital contributions and the name of the company, Meadowfresh's operating agreement is the same as Maple Grove's.

salary of $45,000 to $50,000 a year.[4] Likewise, Kyle Bounous, a member of Meadowfresh but not Maple Grove, was also paid for silage purchased from him by Maple Grove. One year, Mr. Bounous received close to $80,000 from Maple Grove for the silage. Leon Rinehart was a member of Maple Grove and raised some calves for which Maple Grove acknowledged it owed him. Leon Rinehart's son, Kyle Rinehart, received a salary while employed by Maple Grove.

Drs. Ted and Carol Dahlstrom, members of both Meadowfresh and Maple Grove, are veterinary doctors and owned The Animal Clinic of Monett, LLC ("the Animal Clinic"). The Animal Clinic provided veterinary services and care for the cows and it billed Maple Grove for those services. The Animal Clinic charged Maple Grove $483,979 for services throughout the years. The Animal Clinic made between 10 and 20 percent profit on veterinary services to Maple Grove. Dr. Ted Dahlstrom acknowledged receiving compensation for providing veterinary services to Maple Grove.

**Mr. Fulton's Compensation as Manager**

Mr. Fulton testified that the operating agreement authorized him to be compensated for serving as manager. Mr. Fulton's salary for the first 17 to 18 months was $3,500 per month. He did not take a draw his first 12 months because he wanted to make sure the business was profitable. Instead, during this first year, Mr. Fulton's $42,000 salary was left in the company and treated as a capital contribution.

In August 2012, Mr. Fulton sent two emails to "[a]ll the members of Maple Grove and Meadowfresh, plus Tammy and Kyle Rinehart" explaining he "just wanted them all to know what [he] was doing and how [his] thought process was working. And [he] felt

---

[4] There was also testimony that Mr. Hall's salary was higher and fluctuated from $50,000 to $53,500 per year. The actual amount of the salary is insignificant to the resolution of any issue on appeal.

like [he] needed to get compensated for the stuff [he] was doing, at least something[.]"

Mr. Fulton's August 15, 2012 email proposed the following:

> a) Compensation for the $14,000 income negotiated in August 2011 as part of the original purchase deal. This is to be considered as a "fee" to get business started.
> b) Compensation of $3500/month from 11/1/2011 until 31/10/2012 for strategic, financial and planning and organizational services provided.
> c) Shareholders to review the ongoing compensation, i.e.: from 11/01/2012 at a strategic planning meeting to be arranged for mid October 2012.

In May 2013, Mr. Fulton wrote to Dr. Ted Dahlstrom and Leon Rinehart, stating "I write to seek approval (need majority only) for an increase in my management fee." At trial, Mr. Fulton explained that he "didn't need approval, because [he] already had it through the operating agreement, but what [he] wanted to make sure of was that people were engaged and connected."

Mr. Fulton received no negative feedback or objections regarding his compensation proposal in the August 2012 emails. In fact, the Dahlstroms sent an email to Mr. Fulton, on or around May 24, 2013, approving a pay raise. Further, during his tenure as manager, he never received a single text, e-mail, document, note or notification at any point in time that the members had problems with the way he was managing the farm.[5]

In November 2012, Mr. Fulton started receiving an actual salary rather than receiving credit as a capital contribution. Mr. Fulton set his salary at $114,000. Mr. Fulton asked for the increase because the job required more time and management and

---

[5] Dr. Ted Dahlstrom admitted that Mr. Fulton has high level business skills and experience in management positions and that he was worthy of a salary based on those factors "at some point," but claims he did not agree that Mr. Fulton would receive a salary for managing Maple Grove Farms or that Mr. Fulton's management fee would grow as the business grew.

more personal capital input than he ever expected. Over the four years he was at Maple Grove, Mr. Fulton received total compensation in the amount of $350,122.

Mr. Fulton claimed that his salary as manager was discussed "at length a lot of times" especially with Mr. Bounous and the Dahlstroms. These conversations were held during meetings conducted in Mr. Fulton's home basement. He further testified, "We had heaps and heaps of meetings before this whole thing started and continued after it started." According to Mr. Fulton, Mr. Hall was the only one who was not informed of Mr. Fulton's pay increase.

The Dahlstroms acknowledged that Mr. Fulton would receive a management fee in a letter they sent to immigration officials supporting Mr. Fulton's application for a green card:

> Now that he is in a position to apply for a green card we have taken the opportunity to utilize his skills to assist us improve our business and investment opportunities here in the United States. . . . A farm we collectively have an investment share in, will also pay him a management fee that will grow as the business grows.

Dr. Ted Dahlstrom admitted there were no texts, emails, notes or documentation to prove there was an agreement not to compensate members for services.

**The Breakdown in the Relationship**

In 2015, the members of Maple Grove became upset with Mr. Fulton's rate of compensation. They questioned Mr. Fulton's authority to pay himself a salary for his full-time work despite the fact that the other members received compensation for their services provided to Maple Grove.

Appellants began to exclude Mr. Fulton from Maple Grove business and communications, including changing the company's bank account and loan accounts. On

6

July 3, 2015, there was an attempt to hold an official meeting of Maple Grove. The members of Maple Grove did not send notice indicating that any vote would take place, and Mr. Fulton, the only one authorized to act on Meadowfresh's behalf, did not appear. At that meeting, the members voted to remove Mr. Fulton as the manager of Maple Grove. Minority members, the Dahlstroms and Mr. Bounous, purportedly voted on behalf of Meadowfresh.

Appellants also attempted to remove Mr. Fulton as Maple Grove's DFA authorized representative. When that attempt was rejected by DFA because they did not have Meadowfresh's signature, Appellants attempted to solve the problem by retroactively altering various corporate documents to reflect the expulsion of Meadowfresh as the majority owner of Maple Grove.[6]

### Post-Meeting Consequences and Damages

After the meeting, Appellants took actions to prevent Mr. Fulton from accessing Maple Grove funds and removed his ability to oversee Maple Grove operations. Appellants failed to pay Meadowfresh its interest in the company and doubled the other members' interest in Maple Grove.

The minority members redistributed Meadowfresh's membership interest among themselves, with no compensation to the Fultons, and gifted to Mr. Bounous, who had previously only been a member of Meadowfresh and not Maple Grove, a 25%

---

[6] The backdated meeting minutes incorrectly identified the meeting as having occurred on July 6th and stated that the meeting was to remove Meadowfresh. The handwritten notes of the meeting on July 3, however, only stated that there was a unanimous decision to remove Mr. Fulton as managing member by all attending members. There was no reference to any action being taken as to Meadowfresh in the original meeting minutes. The altered minutes added "and Meadowfresh was removed as a shareholder." All Maple Grove members, except Meadowfresh, signed the document making the representation.

     Mr. Hall said that it is "accurate" that the handwritten meeting minutes were destroyed, not all texts were produced, and that he created a new email address and did not initially disclose the new email address during the discovery process.

7

membership interest in Maple Grove for no consideration or capital contribution. Although Appellants' actions purportedly caused a forfeiture of all Meadowfresh's interest in Maple Grove, they compounded the Fultons' (the largest owners of Meadowfresh) damages by refusing to release them from their obligations under personal guaranties on the debts held by Maple Grove.[7]

As a result of the actions taken at the July 3, 2015 meeting, Mr. Fulton was no longer able to manage Maple Grove. Mr. Fulton was forced to sell some of his shares in his farm in New Zealand. Mr. Fulton lost his $114,000 base salary along with an additional $24,000 he was receiving for feed. He also incurred attorney's fees. He received $134,000 for his shares of his New Zealand farm but estimated a loss of 50% on the value of the shares due to the market conditions at the time in New Zealand. Curtis Hall and Leon Rinehart took over as purported co-managers of Maple Grove, changed the bank account from Mr. Fulton being a signatory and without his knowledge, denying him access to the funds of Maple Grove.

After the July 2015 meeting, Mr. Fulton discovered that Appellants had attempted to kick him out as manager and filed the underlying lawsuit based on Appellants' actions. After Respondents filed the underlying lawsuit, Appellants created a company that did business with Maple Grove called All American Cattle Leasing, LLC ("AACL").[8] AACL borrowed 2.1 million dollars and purchased the loans held by Maple Grove; the original loans were not repaid. Appellants acknowledged that they did this so that

---

[7] We note that Susan Fulton is not listed as a guarantor on the loan document in the record on appeal.

[8] At trial, an expert testified that AACL was an alter-ego of Maple Grove. He based that opinion on a number of things, including that the members of AACL were the same as the members of Maple Grove and that there did not appear to be business transacted or minutes kept outside the minutes kept for Maple Grove. He also testified that it appeared AACL was set up to deplete Maple Grove of capital. This opinion was based primarily on the lease between Maple Grove and AACL and the purchase of the Arvest Bank loans.

Meadowfresh and the Fultons would remain guarantors on the notes. The guaranties of debts under these notes were in proportion to each members' ownership interest. Accordingly, the Fultons, as owners of a 75% interest in Meadowfresh, were guarantors of the largest amount of debt. Appellants acknowledged that they could foreclose on Maple Grove's assets if they wanted. Appellants wanted the assets held in a different company other than Maple Grove because "[t]hat's the only way [Appellants] could get the assets."

AACL also entered into a lease agreement with Maple Grove where AACL owned the cattle and leased them to Maple Grove. AACL's lease agreement with Maple Grove included terms favorable to AACL. Maple Grove paid the expenses while AACL got 100% of the proceeds from milk sales. The lease began in February of 2016 for a period of two years. The lease agreement provided that 100% of all proceeds earned for milk production owned by AACL at Maple Grove would be paid to AACL for the first 12 months. Maple Grove had to pay all health and maintenance costs of the cows. Accordingly, Maple Grove had to pay all expenses associated with the cows that it could not afford to buy, but 100% of all the proceeds from those cows went to AACL for the first twelve months. Maple Grove was already a defendant in this lawsuit at the time the lease was made.

Maple Grove began to fail as a business with a high "cull and death rate" of the dairy cows. Several AACL cows died in the first year. The lease agreement provided that any loss more than 10% is to be reimbursed to AACL. The loss was over 10%. Dr. Ted Dahlstrom admitted that the "cull and death rate" was high and that it occurred under his watch. In fact, Maple Grove lost 62% of the AACL herd. Maple Grove had to cover

all expenses, give AACL all proceeds, and reimburse AACL for the cost of the cows. Maple Grove had not paid all proceeds for milk production to AACL and Maple Grove had not reimbursed AACL for the costs of the cattle deaths.

Maple Grove owed AACL $250,000 under the lease and approximately another $275,000 in loans. These are debts on the books of Maple Grove. Maple Grove only paid AACL $5,000. AACL had the ability to foreclose on Maple Grove and all assets owned by Maple Grove. AACL had no other business other than with Maple Grove. AACL has never provided written notice of any meeting and it has never produced any meeting minutes. AACL has no budgets or corporate books and uses the same email address as Maple Grove. Maple Grove paid the attorney's fees for AACL up through June 30, 2017. The attorney's fees between Maple Grove and AACL were not separated until after Respondents sent discovery requests regarding attorney's fees.

## The Criminal Charges

Several months after Respondents' filed their civil suit and approximately three years after Mr. Fulton began receiving compensation for his work, Dr. Ted Dahlstrom and Kyle Bounous, on behalf of Appellants, contacted the Barry County Sheriff's Department and told Detective Evenson their concerns with Mr. Fulton's compensation. According to Mr. Bounous, he contacted his personal attorney, Donald Cupps, regarding Mr. Fulton's compensation before going to the Sheriff's office. Mr. Bounous told Mr. Cupps he was concerned about the checks Mr. Fulton had written to himself. Mr. Cupps told Mr. Bounous to take the information, the checks, and the operating agreement to the Barry County Sheriff's Department.

Mr. Bounous and Dr. Ted Dahlstrom went to the Barry County Sheriff's Department and met with Detective Evenson. Dr. Ted Dahlstrom testified at trial that he did not provide Detective Evenson with all of the details related to Mr. Fulton's compensation. He testified the information provided to the detective could be interpreted as false and that he now interprets it as false. Dr. Ted Dahlstrom admitted he did not point out the provision in the operating agreement giving Mr. Fulton sole discretion to pay expenses and did not mention that they received advice from an attorney on that same issue the year before. Dr. Ted Dahlstrom admitted he did not tell the detective about Curtis Hall receiving a salary or that his veterinary clinic was paid by Maple Grove. Dr. Ted Dahlstrom testified that he "regret[ted] not giving all the information to the sheriff's department."

However, based on the information provided to Detective Evenson, the Barry County Prosecuting Attorney filed a criminal complaint against Mr. Fulton in May 2016. The criminal complaint contained one count of Class B felony theft, pursuant to section 570.030, RSMo Cum. Supp. 2009, and alleged that:

> on or about November 30, 2012 . . . the defendant appropriated funds of a value of at least twenty-five thousand dollars, which property was owned by Maple Grove Farms LLC, and the defendant appropriated such property without the consent of Maple Grove Farms and with the purpose to deprive them thereof.

The funds Appellants alleged Mr. Fulton "stole" were paid to him as his compensation for his full-time work as manager of Maple Grove. The probable cause statement in support of the complaint stated that Mr. Fulton did not have authorization to pay himself and was based on Appellants' representations to the Barry County Sheriffs' Department.

11

After charges were filed, Mr. Fulton appeared in Barry County Circuit Court through counsel where he presented evidence to the prosecuting attorney that the statements made to the Sheriff's office by Appellants were false and the subject of the ongoing civil lawsuit. Mr. Fulton spent $5,000 in attorney's fees defending the criminal charges. The Barry County Prosecuting Attorney voluntarily dismissed the criminal charges against Mr. Fulton. Detective Evenson testified (through deposition transcript) that after he learned about the pending lawsuit, he no longer believed there was probable cause for filing charges against Mr. Fulton.

The Fultons were devastated and terrified that criminal charges were filed against Mr. Fulton. Mrs. Fulton testified that it negatively impacted Mr. Fulton's health. The Fultons felt uncomfortable, quit attending events they had been invited to, and were afraid people were talking about them. Mr. Fulton amended his petition against Appellants to include a claim for malicious prosecution.[9]

**The Pending Lawsuit**

Respondents' lawsuit alleged nineteen counts arising from the breakdown in the business relationship among the parties. Respondents chose not to submit all counts to the jury.[10] The issues before the jury were:

(1) Mr. Fulton's claims (Count XVI) against the Dahlstroms, the Halls, Leon

Rinehart, and Bounous for malicious prosecution;

---

[9] Mr. Fulton testified that he is a green card holder and has currently applied for citizenship. As a part of that process to becoming a U.S. citizen, Mr. Fulton had to disclose that he had been charged with a crime.

[10] Respondents' remaining claims, Count II, an application for judicial dissolution of Maple Grove pursuant to section 347.143.2, and Count XIV, an action for accounting, were severed into a separate lawsuit. Maple Grove elected not to submit its counterclaim against Mr. Fulton for breach of fiduciary duty. Appellants Kyle Bounous and Dr. Ted Dahlstrom abandoned their claims for accounting and dissolution of Meadowfresh.

12

(2) Meadowfresh's (Count III) claims against Maple Grove, the Dahlstroms, the Halls, Leon Rinehart, and Bounous for breach of contract;

(3) Meadowfresh's and the Fultons' claims (Count IX) against Maple Grove, the Dahlstroms, the Halls, Leon Rinehart, Bounous, and AACL for civil conspiracy;

(4) Mr. Fulton's claims (Count IV) against Maple Grove, the Dahlstroms, the Halls, Leon Rinehart, and Bounous and for breach of contract;

(5) Mr. Fulton's claims (Count VIII) against Maple Grove, the Dahlstroms, the Halls, Leon Rinehart and Bounous for tortious interference with a contract;

(6) The Fultons and Meadowfresh's claims (Count X) for piercing the corporate veil of the Maple Grove Appellants, Meadowfresh Appellants, and AACL;

(7) Maple Grove's claim against Mr. Fulton for conversion;

(8) Maple Grove's claim against Mr. Fulton for negligence; and

(9) whether Respondents Meadowfresh and Mr. Fulton were entitled to attorney's fees.

Prior to trial, the trial court entered partial summary judgment on Count I of Respondents' Fifth Amended Petition in Respondents' favor as to whether a quorum was present at the July 3, 2015 meeting, whether Mr. Fulton had been removed as manager, and whether Meadowfresh had been expelled as a member of Maple Grove. The court held all actions "purported to have been taken by the company at that meeting are necessarily void and of no effect." Appellants did not contest the trial court's entry of summary judgment on this issue and admitted all facts upon which the summary judgment was based.

A two-week jury trial was conducted on the remaining issues. Respondents and Appellants (except Carol Dahlstrom and Lisa Hall) testified, along with three expert witnesses on behalf of Respondents. After Respondents and Appellants presented their evidence, the trial court entered a partial directed verdict as to the element of breach on Respondents' breach of contract claim based on its prior entry of summary judgment finding that Appellants' conduct in conducting the July 3, 2015 meeting in the absence of a quorum was in violation of the operating agreement.

The jury found in favor of Respondents on every count submitted, as well as Appellants' counterclaim. The jury also found that Appellants created and misused AACL, and pierced the corporate veil as to that company.

While Appellants' claim multiple allegations of error on appeal, the gravamen of their primary and first argument challenges the trial court's grant of a partial directed verdict on the issue of whether Appellants' breached the Maple Grove Operating Agreement by conducting the July 3, 2015 meeting without a quorum. The trial court's basis for entry of partial directed verdict was its entry of summary judgment on that issue, which Appellants do not challenge. Instead, Appellants argue that because the trial court entered summary judgment finding that a quorum was not achieved as required by the operating agreement, it was impossible for them to breach the contract because their actions were "void and of no effect." We reject this argument, but before addressing this argument on the merits, we address the contentions by Appellants that have not been preserved for appellate review.

**Issues Not Preserved for Appeal**

Appellants raised 11 points on appeal; however, we do not reach the merits of

14

many of these points. Appellants have failed to preserve Points II, III, IV, VI, VIII, IX, X and XI for appellate review. These points combine multiple legal issues into a single point, include allegations of error that were not objected to at trial (or objected to on alternate grounds than complained of in their brief), and impede disposition on the merits by failing to give the court and opposing counsel notice of their arguments. While we prefer to resolve issues on the merits, we cannot examine the multiple issues raised in each of these points without assuming the role of advocate. ***Thummel v. King***, 570 S.W.2d 679, 686, 690 (Mo. banc 1978). Moreover, by combining multiple allegations of error into a single point, Appellants have obfuscated the issues and have failed to advise this Court of the precise contentions asserted and the merits thereof. Accordingly, these points are dismissed.

*Points II, III and IV are multifarious*

Points II, III, and IV are multifarious and preserve nothing for appellate review. Rule 84.04(d)(1)(A)[11] requires each point relied on to "[i]dentify the trial court ruling or action that the appellant challenges[.]" This rule allows appellants to challenge only *one* trial court ruling or action in a single point relied on. ***Rogers v. Hester ex rel. Mills***, 334 S.W.3d 528, 536 (Mo.App. S.D. 2010).

Compliance with Rule 84.04 is mandatory and "facilitates full advocacy and affords the opportunity for clarification by meaningful questions directed to the issues stated in the points relied on." ***Thummel***, 570 S.W.2d at 686.

> If the appellate court is left to search the argument portion of the brief (or even worse, to search the record on appeal) to determine and clarify the nature of the contentions asserted, much more is at stake than a waste of judicial time . . . . The more invidious problem is that the court may interpret the thrust of the contention differently than does the opponent or

---

[11] All rule references are to Missouri Court Rules (2019), unless otherwise specified.

differently than was intended by the party asserting the contention. If that happens, the appellate process has failed in its primary objective of resolving issues raised and relied on in an appeal.

*Id.* When appellate review is impeded, "a point must be disregarded, reviewed only for plain error, or the appeal with respect to that point dismissed." *Bolz v. Hatfield*, 41 S.W.3d 566, 571 (Mo.App. S.D. 2001). "A brief impedes disposition on the merits when it fails to give notice to the other parties and to the appellate court of the basis for the claimed error." *Id.*

"When . . . appellants collapse disparate contentions of error into a single point relied on, they violate Rule 84.04(d)." *Cooper v. Bluff City Mobile Home Sales, Inc.*, 78 S.W.3d 157, 167 (Mo.App. S.D. 2002). Points that include multiple issues are multifarious and preserve nothing for appellate review. *City of Joplin v. Wallace Bajjali Development Partners, L.P.*, 522 S.W.3d 327, 330 (Mo.App. S.D. 2017). A point relied on should contain only one issue, and parties should not group multiple contentions about different issues together into a single point relied on. *Id.*

Points II, III, and IV combine multiple allegations of instructional error into a single point relied on.

Point II states:

The trial court erred in submitting Instruction Nos. 14 and 16 for Meadowfresh and Nos. 22, 24, and 26 for Fulton because those instructions allowed the jury to render verdicts that were contrary to the trial court's pretrial rulings, in that, on July 17, 2017, the trial court ruled that any purported action taken at the July 3, 2015 meeting was "void and of no effect" so there was no legal basis for submission of the claim that Meadowfresh was expelled from Maple Grove nor any legal basis for submission of the claim that Fulton was terminated as Manager of Maple Grove.

16

This point challenges five distinct actions by the trial court: the submission of Instructions 14, 16, 22, 24, and 26. Accordingly, resolving this issue on the merits would require this Court to address each allegation of instructional error separately, beginning with an analysis of whether Appellants objected to each of these instructions at trial on the precise grounds they now complain of on appeal. Our attempt to do just that revealed that only Instructions 14 and 16 were objected to on the grounds complained of in Point II. Instruction 24 was not objected to at all and Instructions 22 and 26 were objected to on other grounds. Moreover, even if each instruction had been properly objected to, in order to resolve this point we would have to consider whether each instruction, separate from the others, was submitted in error and whether that error was prejudicial to Appellants. Appellants have failed to explain how each instruction was preserved for appeal, how each instruction, in its own right, constituted legal error, and how each instruction prejudiced Appellants. We decline to do the analysis for Appellants since it is not the role of this Court to function as advocate. Because these instructions are separate trial court actions that require separate analyses, Appellants have violated Rule 84.04(d) by combining them into a single point relied on.[12] Point II is dismissed.

---

[12] Appellants have failed to demonstrate how each allegation of error was preserved for appeal by objecting to it at trial. For example, Appellants objected to Instruction 22, patterned after MAI 26.06, on the grounds that it "omits elements required by MAI 26.06." Appellants' objection on this particular instruction is different than the grounds they now complain of in Point II of their brief—which is that it was not consistent with the trial court's pretrial rulings. Likewise, Appellants' objection to Instruction 26 differs from the grounds they complain of in their brief. Appellants objected to Instruction 26 on the grounds it "is the second time that a count for conspiracy has been instructed in a separate package . . . . [W]e will object to the submitting of punitives on both of these conspiracy counts as well." Respondents' counsel argued:

> [T]he two different conspiracy packages are for different plaintiffs, all of which were listed in the conspiracy count in the petition. In addition, the two conspiracy counts, besides relating to different plaintiffs, relate to different conduct . . . it's proper to submit punitive damages based on the individual conduct for the individual plaintiffs against the defendants in each of the two conspiracy packages.

Likewise, Appellants' Point III fails for the same reason. This point states:

> The trial court erred in submitting Instruction Nos. 16 and 26 and Verdict Forms B and C because the design of those instructions and verdict forms allowed the jury to render duplicative and overlapping verdicts, in that, the instructions and verdicts (1) make two actual and punitive damage awards for one claim of civil conspiracy, (2) make duplicative actual damage awards on related claims, and (3) awarded punitive damages on contract claims for which the law does not allow punitive damages.

Point III challenges multiple actions of the trial court—the submission of Instructions 16 and 26 and Verdict Forms B and C—and each of these allegations of error require separate and distinct analyses in order to resolve them on the merits. Accordingly, Point III is multifarious, and preserves nothing for appellate review. Point III is dismissed.

Appellants' Point IV suffers from the same defects as Points II and III. Point IV states:

> The trial court erred in giving jury Instructions Nos. 13-20 and 21-30 and Verdicts B and C because these two packages each submit more than one claim per package, in that, M.A.I. Instructions direct that one claim be submitted per package, and, in that, the election of alternate theories of recovery rule prohibits submitting multiple theories as to a single claim and, in that, the instruction packages as drafted constitute roving commissions.

This Point challenges the trial court giving Instructions 13 through 30 and Verdict Forms

---

Appellants' counsel argued that even if the conduct is different, one defendant can only be punished by punitive damages one time. This objection differs from their contention that the trial court's submission of the instructions was inconsistent with the trial court's summary judgment order. Finally, Appellants did not object to Instruction 24 at all. Accordingly, they did not preserve that precise allegation of error for review even if the issues had been brought in separate points relied on.

18

B and C.  Because this point challenges multiple actions of the trial court, like Points II and III, it is multifarious and preserves nothing for review.[13]  Point IV is dismissed.

---

[13] Even if Appellants had not raised multiple issues in a single point relied on, they have failed to demonstrate how each allegation of instructional error was preserved for appellate review.  Appellants proposed Instructions 15, 20, 25, and 30, and made no objection to Instructions 17-19 and 23-24:

> THE COURT: Instruction 17 is patterned after MAI 33.03, submitted by [Appellants]. Any objection by [Respondents]?
>
> [RESPONDENTS' ATTORNEY]:  No, Your Honor.
>
> THE COURT:  Instruction 18 is patterned after MAI 4.01, submitted by [Respondents]. Any objection by [Appellants]?
>
> [APPELLANTS' ATTORNEY]:  No, Your Honor.
>
> THE COURT:  Instruction 19, patterned after MAI 10.01; submitted by [Respondents]. Any objection by [Appellants]?
>
> [APPELLANTS' ATTORNEY]:  No, Your Honor.
>
>    . . . .
>
> THE COURT: Instruction No. 20, patterned after MAI 33.16, has the numerals 19 and 16 embedded in that order, submitted by [Appellants].  Any objection by [Respondents]?
>
> [RESPONDENTS' ATTORNEY]:  No, Your Honor.
>
>    . . . .
>
> THE COURT: Instruction No. 23, patterned after MAI 33.03; it is submitted by [Appellants]. Any objection by [Respondents]?
>
> [RESPONDENTS' ATTORNEY]:  No, Your Honor.
>
> THE COURT:  Instruction No. 24, patterned after MAI 23.11; it is submitted by [Respondents].  Any objection by [Appellants]?
>
> [APPELLANTS' ATTORNEY]:  No, Your Honor.
>
> THE COURT:  Instruction No. 25, patterned after MAI 33.03; submitted by [Appellants]. Any objection by [Respondents]?
>
> [RESPONDENTS' ATTORNEY]:  No, Your Honor.
>
>    . . . .
>
> THE COURT: Instruction 27 is patterned after MAI 33.03; submitted by [Appellants]. Any objection by [Respondents]?
>
> [RESPONDENTS' ATTORNEY]:  No, Your Honor.

19

*Points VI, IX, X and XI were not preserved for appeal by failing to raise the issue at trial.*

Appellants have failed to preserve Points VI, IX, and XI for appellate review by failing to raise the issues before the trial court. Rule 84.13(a) provides that "allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case." Moreover, Rule 70.03 provides:

> Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto on the record during the instructions conference, stating distinctly the matter objected to and the grounds for the objection. The objections must be raised in the motion for new trial in accordance with Rule 78.07.[14]

The rationale behind requiring counsel to make objections is to avert error and allow the trial court an opportunity to make a ruling. ***Gamble v. Bost***, 901 S.W.2d 182, 188 (Mo.App. W.D. 1995). In order to properly raise an issue on appeal, the allegations of error must be "'based upon the theory voiced in the objection at trial and a defendant cannot expand or change on appeal the objection as made.'" ***Gill Const., Inc. v. 18th & Vine Authority***, 157 S.W.3d 699, 718 (Mo.App. W.D. 2004) (quoting ***Zakibe v. Ahrens & McCarron, Inc.***, 28 S.W.3d 373, 387 (Mo.App. E.D. 2000)).

*Point VI*

In Point VI, Appellants claim the trial court erred in submitting claims for breach of contract and tortious interference against the Dahlstroms because the claims are

---

THE COURT: Instruction No. 28, patterned after MAI 4.01; submitted by [Respondents]. Any objection by [Appellants]?

[APPELLANTS' ATTORNEY]: No, Your Honor.

[14] Rule 78.07 provides that in jury tried cases, allegations of error *must* be included in a motion for a new trial in order to be preserved for appellate review. Rule 78.07(a) (emphasis added). There are exceptions, however. Questions of subject matter jurisdiction, questions presented in motions for judgment under Rule 72.01(b), and questions relating to motions for directed verdict that are granted at trial do not need to be included in such motion to preserve the issues for appeal. Rule 78.07.

20

mutually exclusive in that the Dahlstroms, as contracting parties, could not be liable as parties interfering with the contract. This issue was not raised before the trial court.

While Appellants claim this issue was preserved by their filing of motions for directed verdicts and renewed by their post-trial motion, our review of those documents reveals no mention of the argument they are now making. Appellants' Motion for Directed Verdict merely states, "All of [Appellants] state that [Respondents'] evidence and the reasonable inferences therefrom fail to make a submissible case against any [Appellants]." This motion does not put the trial court on notice that Appellants were claiming that the Dahlstroms could not be liable for both a breach of contract and tortious interference with a contract. Similarly, we do not see this precise issue referenced in their Brief in Support of their Motion for Judgment Notwithstanding the Verdict or, in the alternative, Motion to Set Aside, Alter or Amend Judgment and Motion for New Trial. Nowhere on pages 9-11 (as cited in Appellants' brief) is this issue—whether the breach of contract and tortious interference claims against the Dahlstroms were mutually exclusive—raised. The crux of their argument in their brief in support of their motion, to the extent we can discern it, is that Verdict Forms B and C "allow[ed] the jury to consider many possible ways and reasons they might award [Respondents] the same set of damages." This does not appear to be the same argument they now make—that the Dahlstroms cannot be liable for both a breach of contract and tortious interference with contract.

Appellants also claim they preserved this error by objecting to the manner of packaging a breach of contract and tortious interference of business expectancy in a single package and point to Respondents' Verdict Directing Instructions 14, 22, and 26.

21

Their objections, like their motion and brief in support of that motion, do not seem to address the precise issue raised in Point VI either.

Appellants objected to Instruction 22, patterned after MAI 26.06, on the grounds that it "omits elements required by MAI 26.06." Appellants objected to Instruction 26, on the grounds it "is the second time that a count for conspiracy has been instructed in a separate package. . . . [W]e will object to the submitting of punitives on both of these conspiracy counts as well." Similarly, Appellants' objection to Instruction 14 was "because this particular verdict director only directs a verdict as to the element of damages." These are not the same objections they now raise on appeal.

Based on these objections, we cannot tell that Appellants were claiming that the Dahlstroms, as contracting parties, could not legally be liable for a breach of contract and tortious interference with a contract. Rather, the objection was to the packaging of the claims and on the grounds that the verdict director omitted the element of breach and that punitives were submitted twice. Allegations of error must be based upon the same theory voiced in the objection at trial and a defendant cannot expand or change the objection as made on appeal. ***Gill Const., Inc.***, 157 S.W.3d at 718. The objection did not put the trial court on notice of their precise allegation of error and give it an opportunity to decide that issue. Point VI is, therefore, dismissed because it preserved nothing for review.

*Point IX*

Like Point VI, Point IX was not raised before the trial court. Appellants contend in Point IX that the "trial court erred in giving jury Instruction No. 8 because that affirmative defense instruction regarding advice of counsel should have included each [Appellant.]"

22

Instruction No. 8 was offered by Appellant Bounous pertaining to his affirmative defense of advice of counsel. Although Instruction 8 was submitted by Appellant Bounous, the other Appellants made the following objection:

> THE COURT: Instruction No. 8 is not an MAI instruction; it is offered by the [Appellant] Kyle Bounous. Any objection by [Respondents]?
>
> [RESPONDENTS' ATTORNEY]: Yes, Judge. We do object to the affirmative defense being offered at all. This is the affirmative defense of attorney advice, relied upon by Kyle Bounous; and a critical element of the defense is that [Appellant] Kyle Bounous relied in good faith on all facts within his knowledge or which he might have otherwise learned by reasonable diligence. The evidence in the case is undisputed that he did not provide to Attorney Cupps all of the information that was within his knowledge, and therefore there is no basis for the jury to find in favor of [Appellant] Kyle Bounous on that particular element, and a verdict returned for Kyle Bounous based on this defense would be in error as it would be based on no evidence; so we do object to it.
>
> [APPELLANTS' ATTORNEY]: Your Honor, as we've discussed, I disagree with that assertion, but I also have a couple objections to make to this instruction.
> While it was submitted by the defense, we originally submitted a form based on the *Sutherland* case, which we believe is also ratified as a jury instruction by appellate opinion. The case that we cited as a basis for our originally submitted instruction was a newer case than this *Haswell* case that this particular instruction is patterned off of. However, after being instructed by the Court to change the formatting, we have done so.
> Additionally, I would like to object in that we have been instructed that this particular instruction ought to refer to the instigation of a legal proceeding. I had originally drafted it to say "the making of a complaint or report with the Barry County authorities." *We believe there is no fact or legal basis to say that our clients instigated a judicial proceeding because they are not entitled to do so by law. I think we've discussed all of that, but as long as that objection is preserved for the record, I am comfortable with moving on,* Your Honor.

(Emphasis added.)

It does not appear that Appellants objected to this instruction on the grounds they now complain of in their brief—that all Appellants should have received this affirmative defense instruction. Because Appellants' objection failed to put the trial court on notice

23

of the alleged error they now claim, Appellants have failed to comply with Rule 70.03. Point IX was not preserved for review and is dismissed.

*Point X*

In Point X, Appellants argue that the trial court erred in entering judgment in favor of Meadowfresh for damages as a result of the loss of value of Maple Grove because Meadowfresh had no standing to assert "the claim" because "the claim" was a derivative claim.[15] We do not reach the merits of Point X because we cannot tell precisely which "claim" Appellants contend was a "derivative claim" since Meadowfresh had multiple claims against Appellants. It is entirely possible that some claims were "derivative" in nature while others were unique to the individual member. However, Appellants' point relied on fails to specify "the claim" it is referring to that was "derivative." In all cases, but especially a complex case involving multiple claims, a point relied on should "[i]dentify the trial court ruling or action that the appellant challenges[.]" Rule 84.04(d)(1)(A). Here, we are left to guess which claim Appellants are referring to, but the confusion does not end there. While Appellants' point relied on does not specify the claim it is challenging, Appellants do reference Counts VI and XI of Respondents' Fifth Amended Petition in the argument portion of their brief. However, these counts were dismissed and never brought before the jury. We are left scratching our heads as to why Appellants reference those counts that were voluntarily dismissed by Respondents. Because we cannot clearly discern which claim Appellants are referring to

---

[15] Appellants' Point X states:

> The trial court erred in entering a judgment in favor of Meadowfresh for damages as a result of the loss of value of Maple Grove because Meadowfresh had no standing to assert the claim and no cause of action was alleged, in that, the claim was a derivative claim for damage to Maple Grove and Meadowfresh failed to plead that it had made a demand on the other Maple Grove members, or that a demand was rejected, or that it would have been futile to make that demand.

and cannot resolve the merits of Point X without assuming the role of advocate, we dismiss Point X for failure to comply with Rule 84.04(d).[16]

### Point XI

In Point XI, Appellants claim the trial court erred in awarding attorneys' fees on the grounds there was no legal basis for the recovery of attorneys' fees. The award of attorneys' fees was a result of Instruction 38 and Verdict Form F. This Instruction directs the jury to find for Meadowfresh and Mr. Fulton on their "claim of declaratory judgment as to their entitlement to attorneys' fees[.]" Appellants failed to object to Instruction 38 or Verdict Form F at trial:

> THE COURT: Instruction 38 is a Not-in-MAI instruction; submitted by [Respondents]. Any objection by [Appellants]?
>
> [APPELLANTS' ATTORNEY]: No, Your Honor.
>
> . . . .

---

[16] According to Appellants, Meadowfresh's claim against Maple Grove was a derivative claim and, therefore, Meadowfresh was required to make demand on the other members or demonstrate that a demand was rejected or would be futile. Even if we could reach the merits of this argument, Appellants' argument fails.

A derivative action is a lawsuit brought by the shareholders as the corporation's representative. *Nickell v. Shanahan*, 439 S.W.3d 223, 227 (Mo. banc 2014). "Derivative claims are aimed at vindicating injuries to the corporation—to the shareholders collectively—and not the shareholders individually." *Id.* (internal quotations and citation omitted). While "the general rule is that shareholder actions against corporate officers and directors are derivative in nature, direct, individual shareholder claims are available to redress individual wrongs." *Id.* "[C]laims by shareholders asserting that they were removed from their positions as controlling shareholders have been found to be actions that must be maintained individually." *Id.*; *see also Gieselmann v. Stegeman*, 443 S.W.2d 127, 131-32 (Mo. 1969) (holding that that plaintiff-shareholders had standing to assert a claim where the gravamen of plaintiff's petition was to recover for the injury to the plaintiffs individually rather than injury to the corporation after the other shareholders unlawfully held a meeting of the board and certain defendants were elected as directors). Here, the gravamen of Meadowfresh's breach of contract claim was to redress its injuries caused by Maple Grove's members failing to give Meadowfresh notice of the meeting; meeting without a quorum by not having Meadowfresh present; modifying corporate documents to show Meadowfresh was voted out; expelling Meadowfresh without cause; and failing to compensate Meadowfresh for its membership interest. Meadowfresh's civil conspiracy claim alleged that Appellants conspired to deprive Meadowfresh of its ownership in Maple Grove and created a company to foreclose on the debts of Maple Grove, which are guaranteed by the owners of Meadowfresh. These injuries are unique to Meadowfresh and are not derived from injuries to Maple Grove as a whole. Accordingly, they are not derivative claims.

25

THE COURT: That ends with Verdict Form F. [Respondents' Attorney], are you satisfied that verdict form will allow the jury to return the permissible verdict in this case?

[RESPONDENTS' ATTORNEY]: Yes, Your Honor.

THE COURT: And [Appellants' Attorney]?

[APPELLANTS' ATTORNEY]: No objection, Your Honor.

Rule 70.03 requires counsel to "make specific objections to instructions considered erroneous." A party may not "assign as error the giving or failure to give instructions unless that party objects thereto on the record during the instructions conference, stating distinctly the matter objected to and the grounds for objection." Rule 70.03. By failing to object to Instruction 38 and Verdict Form F, Appellants have failed to preserve this issue for appeal.

Point XI is dismissed.

*Point VIII raises an issue that cannot be overturned on appeal.*

Appellants' Point VIII claims error in "submitting" the claim for malicious prosecution because it was against the weight of the evidence. Appellants, in the argument portion of their brief, characterize this claim as an assertion that the verdict is against the weight of the evidence. We agree with that characterization and observe that, as such, it preserves nothing for appellate review.

> Weighing evidence remains a trial court function. *Warren* [*v. Thompson*], 862 S.W.2d [513,] 514 (citing *Castle v. Modern Farm Equip. Co.*, 729 S.W.2d 650, 653 (Mo.App.1987)). "An appellate court cannot rule on the weight of the evidence in a jury-tried case." *Warren*, 862 S.W.2d at 514 (quoting *George v. Eaton*, 789 S.W.2d 56, 61 (Mo.App.1990)). The trial court's denial of a motion for new trial challenging the verdict as against the weight of the evidence is a conclusive determination that cannot be overturned on appeal. *Warren*, 862 S.W.2d at 514.

26

***Woods v. Friendly Ford, Inc.***, 248 S.W.3d 699, 705 (Mo.App. S.D. 2008). Point VIII

raises an issue that cannot be overturned on appeal.

**Issues Preserved for Appeal**

*Point I*

In Point I, Appellants challenge the trial court's grant of a partial directed verdict

on the element of breach in favor of Respondents' breach of contract claim on the

grounds the directed verdict was "contrary to the trial court's summary judgment ruling"

in that the trial court's summary judgment held the actions of Appellants were

"necessarily void and of no effect." Because Appellants admit the facts that formed the

basis of the trial court's entry of a partial directed verdict, there was nothing for the jury

to decide on that element and the entry of a partial directed verdict was not in error.

**Standard of Review**

In determining if the trial court's grant of directed verdict is proper, this Court

"views the evidence in the light most favorable to the defendant and disregards any

unfavorable evidence or inferences." ***Parker v. Pine***, 617 S.W.2d 536, 541 (Mo.App.

W.D. 1981). Generally, a verdict may not be directed in favor of the party having the

burden of proof. ***Brandt v. Pelican***, 856 S.W.2d 658, 664 (Mo. banc 1993). There is an

exception to this rule, however:

> "If the opponent, that is that party not having the burden of proof, *admits either in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him,* and if the proof is altogether of a documentary nature and the authenticity and the correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction. This is upon the theory that there is no question of fact left in

27

the case and that upon the questions of law involved the jury has no right to pass."

*Id.* (quoting *Coleman v. Jackson County*, 160 S.W.2d 691, 693 (Mo. 1942)).

Appellants contend in their first point:

The trial court erred in granting a directed verdict for [Respondents] on their breach of contract claims because granting a directed verdict to [Respondents] on the element of breach was contrary to the trial court's summary judgment ruling, in that, [Respondents] bore the burden of proof on the element of breach and the trial court's summary judgment ruling held that the actions allegedly constituting a breach were "necessarily void and of no effect."

Appellants' argument fails because Appellants admit the facts that support the trial court's grant of a partial directed verdict on the element of breach.[17] According to Appellants, the trial court's grant of a partial summary judgment finding that Appellants' conducted the July 3, 2015 meeting without a quorum and in violation of the operating agreement "eliminated any possibility that the actions in question could have constituted a breach of contract" since the actions taken at the meeting were "void and of no legal effect." In other words, Appellants' position is that because Appellants failed to comply with the terms of the operating agreement, Appellants' actions were void and, because they were void, there can be no breach. This reasoning is flawed, circular, and ignores the distinction between the legal effect of *ultra vires* conduct by a company and the actual damages flowing from that conduct. An action that is legally void and ineffective as a matter of law can cause actual damages. A plaintiff may recover those damages.

The trial court instructed the jury to find in favor of Meadowfresh on its breach of contract claim if it believed that because of the attempted expulsion of Meadowfresh, Meadowfresh was thereby damaged. The jury was instructed to determine causation and

---

[17] Appellants admitted each of the facts set forth in Respondents' Statement of Uncontroverted Facts.

28

damages.[18] The problem is that Appellants appear to be contending in their argument that the breach of contract claims were erroneously presented to the jury with the issue of whether there had been a breach of contract as a foregone conclusion; however, Appellants do not challenge the trial court's summary judgment. The summary judgment specifically found that Maple Grove failed to achieve quorum as required by the clear and unambiguous language of the operating agreement. Those undisputed facts are the facts that form the basis of the trial court's grant of a partial directed verdict on the issue of breach, a partial summary judgment that is not on appeal. Appellants appear to argue that because the summary judgment ruling held the subsequent actions were necessarily void and of no effect that the breach could have caused no damages. Ironically, Appellants argue that the only

> supposed breaches of contract were actions taken at the July 3 meeting to expel Meadowfresh as a member of Maple Grove and to remove Jock Fulton as its manager. But the summary-judgment ruling did not establish that these actions were effective, much less that they constituted any breach of the agreement.

We admit to being puzzled by Appellants' argument. Appellants do not dispute the summary judgment ruling that Appellants held a July 3, 2015 meeting without a quorum and that the operating agreement required a quorum. Thus, they admit the key facts on which the trial court's grant of a partial directed verdict on the issue of breach of contract was based. Because it was *undisputed* that the breach occurred, the only remaining issues for the jury to decide on the breach of contract claim were causation and damages. Those issues—causation and damages—were properly left for the jury to

---

[18] In its argument, Appellants point to Instructions 14 and 22 as examples of the prejudicial effect of the trial court's directed verdict. Respondents properly note that each of those instructions include separate breach of contract claims and should have been raised in separate points. Because we think we can discern the heart of both issues, we address Appellants' point.

decide. For this reason, the trial court's grant of a partial directed verdict on the element of breach (i.e., whether Appellants conducted the meeting on July 3, 2015 in violation of the operating agreement) was proper since there was no question of fact for the jury to decide on that precise element.

Again, Appellants do not challenge the partial summary judgment. Maple Grove, was without the legal ability to conduct business at that meeting. The actions by the minority members after that meeting and under the authority of that meeting -- keeping Mr. Fulton from managing the company, causing criminal charges to be filed against Mr. Fulton, decimating the value of the company, creating a company to take all of the assets of the company and leaving Meadowfresh and the Fultons with the company debt, and depriving Mr. Fulton as manager and majority member the rights to access the bank accounts – caused damages according to the jury. Appellants' contention that the finding by the trial court that the breach had no legal effects ignores the reality of fact that the breach of the contract had actual consequences to Respondents. Point I is denied.

*Point V*

In Point V, Appellants argue that the trial court erred in denying their motion for a mistrial based on juror misconduct. As stated by our Supreme Court in **State ex rel. Kemper v. Vincent**, 191 S.W.3d 45, 49 (Mo. banc 2006):

> "A mistrial is a drastic remedy, granted only in extraordinary circumstances." *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994). Whether to grant a mistrial is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Clover*, 924 S.W.2d 853, 856 (Mo. banc 1996). An abuse of discretion occurs when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804 (Mo. banc 1988).

The trial court has not abused its discretion if reasonable people can differ about the propriety of the action taken by the trial court. *Williams v. Daus*, 114 S.W.3d 351, 366 (Mo.App. S.D. 2003).

The moving party typically has the burden of proving that juror misconduct was prejudicial. *Id.* Moreover, the moving party has the burden of proving that the misconduct actually occurred. *State v. Cummings*, 514 S.W.3d 110, 113 (Mo.App. W.D. 2017). A presumption of prejudice only arises through the admission of evidence of juror misconduct. *See State v. Stephens*, 88 S.W.3d 876, 883 (Mo.App. W.D. 2002) ("To be entitled to a new trial for juror misconduct, the movant has the burden of proving that the alleged juror misconduct actually occurred. . . . The mere proof of juror misconduct in obtaining extraneous evidence, however, does not automatically entitle a movant to a new trial. . . . Rather, it raises a presumption of prejudice, shifting the burden to the non-movant to show that no prejudice resulted from the alleged juror misconduct.") (internal citations omitted). Allegations of juror misconduct are not self-proving and must be established by independent evidence. *State v. Smith*, 944 S.W.2d 901, 921 (Mo. banc 1997).

Appellants introduced no evidence that juror misconduct actually occurred. According to Appellants, a juror stuck her head out the door and "asked the bailiff, 'What is civil conspiracy?'" Moments later, the same juror stuck her head out again and declared that they did not need the question answered, because the jury had "Googled it" or they were getting ready to "Google it." Appellants asked for a mistrial, which was denied. Appellants did not request any other relief.

31

In the absence of any admissible evidence, it was not an abuse of discretion for the trial court to deny Appellants' Motion for a Mistrial. The trial court properly brought this information to the parties' attention to give the parties the opportunity to investigate whether a juror Googled "civil conspiracy":

THE COURT: Okay. I discussed with the lawyers this issue, and I do want to put it on the record at this point, that it's been brought to the Court's attention that sometime shortly after the jury went out, one of the jurors, believed to be the foreperson now, would not have known that then, stuck her head out the door and asked the bailiff, "What is civil conspiracy?" The bailiff reported to me that he told her he did not know, but even if he did know, he couldn't answer the question, and that any questions had to be put in writing and sent to the Judge, and he gave her the form. That would be his typical thing to do.

Then it was overheard by someone else that she stuck her head back out and said don't worry, we've Googled it or we will Google it or something using the word Google. He did not hear that so he did not report that to me, but another person heard that.

There is a variety of things we can do about that. Certainly, they have been admonished many times not to Google. **Don't even know if they did Google, to be honest**. Only that was overheard by someone.

**We can do more investigation on that if someone would choose**.

At this point one of the options would be for me to write on this same form, which I'm getting ready to deliver to them answering this question, something to the effect as follows: "You are reminded that you must not do any research or investigation on your own about any matter regarding this case or anyone involved with this trial."

I have been admonishing that at every break for the last two weeks. So with that having been said, [Respondents' Attorney], what's your pleasure with this particular issue?

[RESPONDENTS' ATTORNEY]: [Respondents] consent to that admonishment.

THE COURT: [APPELLANTS' ATTORNEY]?

[APPELLANTS' ATTORNEY]: Your Honor, in view of all of the admonishments you have given them, which were clear, [Appellants] would move for a mistrial.

THE COURT: Okay. What [do Respondents] say?

32

[RESPONDENTS' ATTORNEY]:  **There is no evidence that it actually happened. So there is no basis for a mistrial at this point.**

THE COURT:  **There is no evidence before the Court from which to grant a mistrial. So that motion for mistrial is denied.**
       **[Appellants' Attorney], do you have any request for any other relief?**

[APPELLANTS' ATTORNEY]:  **No, sir.**

(Emphasis added.)

Despite being specifically offered the opportunity by the trial court to take some action/request some relief, Appellants failed to make an offer of proof or elicit some evidence regarding the alleged juror misconduct.  In fact, Appellants explicitly declined such an opportunity.  In the *Travis* case cited by Appellants, unlike here, the actions constituting misconduct were reported by a juror and later put on the record.  *See Travis v. Stone*, 66 S.W.3d 1, 4 (Mo. banc 2002).  Appellants' argument that they should be given a presumption based on self-reported juror misconduct is not well-taken given that there is *no evidence* of juror misconduct in this case, self-reported or otherwise.  Further, it is not Respondents' (or the trial court's) burden to show juror misconduct, but the party seeking a new trial.  *See Cummings*, 514 S.W.3d at 113.  Given Appellants' failure to elicit any evidence of any alleged juror misconduct, they cannot now be allowed to complain in this regard.

Point V is denied.

*Point VII*

Appellants claim that Mr. Fulton did not make a submissible case on his claim for malicious prosecution in Point VII.  Appellants' analysis turns on whether an individual defendant can "instigate" a criminal prosecution where a state agency is responsible for

33

the filing of criminal charges. A case may not be submitted to a jury unless each fact necessary for liability is supported by substantial evidence. *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 204 (Mo.App. W.D. 2013). Whether the plaintiff made a submissible case is a question of law that is reviewed *de novo*. *Id.* In determining if the evidence was sufficient to support the jury's verdict, the appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences. *Id.* A jury's verdict will only be reversed for insufficient evidence if there is "a complete absence of probative fact to support the jury's conclusion." *Id.* Because the question in Point VII is a question of whether Mr. Fulton made a submissible case for malicious prosecution, that claim is reviewed *de novo*.

> The elements for a claim of malicious prosecution are:
>
> (1) commencement of an earlier suit against the party; (2) instigation of that suit by the adverse party; (3) termination of the suit in the party's favor; (4) lack of probable cause for filing the suit; (5) malice by the adverse party in initiating the suit; and (6) damage sustained by the party as a result of the suit.

*Copeland v. Wicks*, 468 S.W.3d 886, 889 (Mo. banc 2015).

Appellants challenge the second element of a malicious prosecution claim—the instigation of the suit by the adverse party.[19] Appellants contend that only the prosecuting attorney can bring criminal charges and, therefore, only a prosecuting attorney can "instigate" criminal proceedings. Appellants are mistaken. "To instigate means 'to stimulate or goad to an action, especially a bad action; and that one of its

---

[19] Appellants also challenge the third element—the termination of the suit in the party's favor. However, we do not address Appellants' second argument—that there was not substantial evidence that the proceeding terminated in Mr. Fulton's favor— as it was not addressed in Appellants' post-trial motion, and also requires a separate analysis, rendering the point multifarious. Appellants do not direct us to anywhere else in the transcript or post-trial motions where it was addressed. As such, it is abandoned. "'Appellate courts are merely courts of review for trial court errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court.'" *Woods v. Friendly Ford, Inc.*, 248 S.W.3d 699, 704 (Mo.App. S.D. 2008) (quoting *Robbins v. Robbins*, 328 S.W.2d 552, 555 (Mo. 1959)).

synonyms is 'abet,' which means, in law, to aid, promote, or encourage the commission of an offense.'" ***Crow v. Crawford & Co.,*** 259 S.W.3d 104, 114 (Mo.App. E.D. 2008) (quoting ***Snider v. Wimberly***, 209 S.W.2d 239, 242 (Mo. 1948) (internal quotations omitted)). While it is true that "[m]erely providing honest information from which a prosecution ensues is not instigation, . . . liability may arise from supplying false information to the prosecuting official." ***Id.*** at 115.

Appellants cite to ***Crow*** in support of their position that only a state agency can "instigate" criminal charges. We are not persuaded by Appellants' interpretation of ***Crow*** and find the case readily distinguishable from the facts before us. ***Crow*** involved facts where the appellants admitted there was no malice by the defendants in contacting the Fraud Unit. The unit then conducted an independent investigation before referring the case to the Attorney General's Office. The Attorney General also independently reviewed the materials, which included medical reports and surveillance footage, prior to filing charges. ***Id.*** at 111-114. In the present case, Appellants, only after getting sued by Respondents, contacted law enforcement and intentionally withheld key pieces of information.[20] This is not the same scenario as ***Crow***. Moreover, ***Crow*** makes it clear that liability may arise from intentionally supplying false information to a prosecuting official. ***Id.*** at 115. By intentionally omitting key facts to the detective, Appellants' conduct is tantamount to supplying false information. While it is certainly true that public policy should encourage the uncovering and prosecution of crimes through *honest*

---

[20] Appellants admitted that they did not provide the detective with complete information. Appellants even admitted that some of the information was false. Appellants expressed regret in not having provided the full information. Appellants also knew that the conduct they were alleging as crimes (Mr. Fulton's receipt of compensation for serving as manager) was the subject of an underlying civil suit. Detective Evenson testified that after he learned that some of the information was false and incomplete, he no longer believed that probable cause existed for filing charges against Mr. Fulton. He also testified that had he known the information submitted by Appellants was false, he would not have submitted the probable cause affidavit in the first place. Accordingly, there was sufficient substantial evidence to support the jury's decision.

35

information, it is equally true that sound public policy should discourage vindictive prosecutions arising out of a defendant's supplying of false and incomplete information to law enforcement. Appellants' interpretation of *Crow* would foreclose the possibility of any private citizen ever being held liable under a malicious prosecution claim for intentionally misleading a law enforcement agency into filing criminal charges. The consequences of such conduct should not be taken lightly. The wrongful filing of criminal charges based on misleading information has the potential to wreak significant havoc on an individual. Where a party intentionally withholds key information from law enforcement for the purposes of having another person prosecuted, such an individual has instigated a criminal proceeding and can be held liable for such conduct. Accordingly, Point VII is denied.

## Conclusion

The trial court's judgment is affirmed.

Nancy Steffen Rahmeyer, J. – Opinion Author

Don E. Burrell, P.J., – Concurs

Gary W. Lynch, J., – Concurs